## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

STATE FARM GUARANTY   :
INSURANCE COMPANY   :
One State Farm Plaza   :
Bloomington, IL 61710   :
      :
   and     :
      :
STATE FARM INDEMNITY COMPANY   :    CIVIL ACTION NO.
One State Farm Plaza   :
Bloomington, IL 61710   :
     Plaintiffs   :    PLAINTIFFS DEMAND
      :    A TRIAL BY JURY
    v.     :
      :
MARSHALL CHIROPRACTIC, LLC   :
1195 Main Avenue   :
Clifton, NJ 07011   :
      :
   and     :
      :
JAMES MARSHALL, D.C.   :
72 Agawan Drive   :
Wayne, NJ 07470   :
      :

## **COMPLAINT**

Plaintiffs, State Farm Guaranty Insurance Company and State Farm Indemnity Company (hereinafter referred to as "State Farm Guaranty" and ""State Farm Indemnity" or "Plaintiffs") by and through their counsel, Bennett, Bricklin & Saltzburg LLC, bring this action against Defendants, Marshall Chiropractic, LLC ("Marshall Chiropractic"), James Marshall, D.C. ("Dr. Marshall"), (hereinafter referred to collectively as "Defendants" or the "Clinic") and allege common law causes of action of fraud and unjust enrichment, along with violations of the New Jersey Insurance Fraud Prevention Act, N.J.S.A. §17:33A-1, et seq.. Plaintiffs also seek relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202. In support of their claims, Plaintiffs allege as follows:

## I.      NATURE OF THE ACTION

1.      This action involves Defendants' fraudulent scheme to obtain money from State Farm Guaranty and State Farm Indemnity by submitting, or causing to be submitted, bills and supporting documentation that are fraudulent for services purportedly provided to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("PIP Benefits") under State Farm Guaranty and State Farm Indemnity policies when, in fact, the services are not performed because they are medically necessary. Instead, the services are performed pursuant to a predetermined treatment protocol (the "Predetermined Protocol") that is designed and carried out to enrich Defendants by exploiting the patients' eligibility for PIP Benefits, and not to address the unique circumstances and needs of any individual patient.

2.      The Predetermined Protocol, which has been implemented and carried out by Dr. Marshall at the Clinic, includes: (a) failing to legitimately evaluate patients to determine the true nature and extent of their injuries; (b) failing to arrive at a legitimate treatment plan to address patients' true needs; (c) reporting the same or similar findings for all patients to justify a

predetermined, non-individualized course of treatment which is substantially and materially the same for all patients regardless of other relevant factors; (d) implementing a predetermined course of treatment consisting of the same three passive modalities administered to almost every patient on almost every visit, regardless of each patient's unique circumstances and needs; (e) failing to legitimately reevaluate patients to determine their true need for continued and ongoing care; and (f) submitting documentation to State Farm Guaranty and State Farm Indemnity which falsely represents the evaluations and treatments purportedly provided to patients were legitimately performed and medically necessary when, in fact, Defendants provided the evaluations and treatment pursuant to the Predetermined Protocol and not to address the patients' unique circumstances and needs.

3.     The Predetermined Protocol is not designed to legitimately examine, diagnose and treat patients.  Rather, it is designed and carried out to enable Defendants to fully exploit and collect the patients' PIP Benefits while manipulating the Care Path Provisions of N.J.A.C. §11:3 4.1, *et seq*.

4.     Accordingly, because Defendants performed the above-described services, if at all, pursuant to the Predetermined Protocol, the bills and supporting documentation submitted to State Farm Guaranty and State Farm Indemnity for those services described, in part, in the charts attached hereto as Ex. A (Master Summary Chart - Treatment Billed Each Date of Service), Ex. B (Master Summary Chart – Tenderness and Spasm) and Ex. C (Master Summary Chart – Testing and Treatment Plan), are fraudulent and the charges for those services are not owed.

5.     Defendants have made material misrepresentations to conceal their fraud from State Farm Guaranty and State Farm Indemnity. The bills and supporting documentation for each patient, when viewed in isolation, do not reveal their fraudulent nature. Only when the bills and

supporting documentation are viewed together across the claims at issue do the patterns emerge revealing the Predetermined Protocol and Defendants' fraudulent scheme.

6.      The Defendants' fraudulent scheme began at least as early as 2014, and has continued uninterrupted since that time. As a direct and proximate result of the scheme, Plaintiffs have incurred actual damages of at least $850,000 in PIP Benefits paid to the Clinic. Specifically, State Farm Guaranty has incurred damages in excess of $250,000.00 and State Farm Indemnity has incurred damages in excess of $600,000.00.

7.      This action asserts common law causes of action for fraud and unjust enrichment to recover actual damages of more than $850,000.00 in PIP Benefits paid to the Clinic.  Further, this action asserts a cause of action for violation of the New Jersey Fraud Prevention Act.  Finally, this action seeks a declaratory judgment that Plaintiffs are not liable for any pending unpaid bills submitted by or on behalf of the Clinic to date and through the trial of this case based upon the above-described conduct.

## II.   JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states.

9.      Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because this is the jurisdiction where a substantial part of the events or omissions that gave rise to the claims occurred.

## III.  PARTIES

### A.   Plaintiffs

10.     State Farm Guaranty and State Farm Indemnity are each a citizen of Illinois. Plaintiffs are corporations organized under the laws of Illinois, with their principal places of

business in Bloomington, Illinois. At all relevant times, Plaintiffs were licensed in New Jersey to engage in the business of insurance.

**B.** **Defendants**

11.    Defendant Marshall Chiropractic is a limited liability corporation with its principal place of business located at 1195 Main Avenue, Clifton, NJ 07011.  Upon information and belief, Marshall Chiropractic was created in and under the laws of the State of New Jersey and any and all shareholders/members of Marshall Chiropractic are citizens of a state other than Illinois.

12.    Defendant Dr. Marshall, a licensed chiropractor, is an adult individual who, since 2002, is the owner of Marshall Chiropractic. During the relevant period, Dr. Marshall was, and continues to be, a proprietor, owner, officer, employee, agent and/or shareholder/member of Marshall Chiropractic.  Upon information and belief, Dr. Marshall resides and is domiciled in and is a citizen of New Jersey.

**IV.    ALLEGATIONS COMMON TO ALL COUNTS**

**A.    Pertinent Law Governing New Jersey's Personal Injury Protection/No-Fault Insurance Payment Statutes**

13.    State Farm Guaranty and State Farm Indemnity underwrite automobile insurance in New Jersey.

14.    New Jersey has established a system for compensating victims of automobile accidents for their injuries, as is set forth in N.J.S.A. §39:B-1 to -3 and N.J.S.A. §39:6A-1, *et seq.*, also known as the Automobile Insurance Cost Reduction Act ("AICRA").  The AICRA requires automobile insurers to provide Personal Injury Protection ("PIP") benefits to their insureds.

15.    Pursuant to the statutory provisions, an insured is permitted to assign his or her right to PIP benefits to healthcare providers for payment of the treatment rendered.  Providers can submit claims seeking payment for medically necessary services directly to insurers under this statutory

5

scheme. To be eligible to receive PIP benefits, the provider must comply with all relevant laws and regulations governing healthcare in the State of New Jersey.

16.     Plaintiffs, as automobile insurers subject to these statutes, are not required to reimburse healthcare providers from an insured's PIP benefits if the provider's services did not comply with all applicable statutory and regulatory requirements governing the provision of healthcare services in the State of New Jersey.

17.     Pursuant to N.J.S.A. §39:6A-4, an insurer is only required to pay PIP benefits for medically reasonable, necessary, and appropriate treatment.

18.     N.J.S.A §39:6A-2(m) defines "medically necessary" as treatment that is consistent with the patient's symptoms or diagnosis, and is treatment of an injury that:

    (1)     is not primarily for the convenience of the injured person or provider,

    (2)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and

    (3)     does not involve unnecessary diagnostic testing.

19.     New Jersey has also established a statutory Fee Schedule to prohibit providers from charging excessive amounts for services covered by PIP benefits. N.J.S.A. §39:6A-4.6; N.J.AC. §11:3-29.4.

20.     Claims for PIP benefits are submitted by healthcare providers utilizing current procedural terminology ("CPT") codes set forth in the Fee Schedule to represent the described service (a) was actually performed, (b) was performed by a person or persons properly licensed or certified under state law to provide that service, and (c) was reasonable and medically necessary for the treatment of the patient and conducted in accordance with applicable laws and regulations.

21.     The Department of Banking and Insurance has published standard courses of treatment, known as "Care Paths," for soft-tissue injuries of the neck and back pursuant to N.J.A.C. §11:3-4.

22.     The Care Paths allow that patients who present with soft-tissue injuries may undergo conservative care for up to four weeks consisting of (a) up to five office visits; (b) medications; (c) bed rest; (d) exercise; (e) consideration of the use of durable medical equipment, such as soft neck collars, for up to 48 hours; (f) consideration of physical therapy (2-3 times per week, up to 4 weeks, maximum 12 visits); and (g) consideration of spinal manipulation (1-3 times per week, up to 4 weeks, maximum 12 visits). While the Care Paths identify these possible courses of care, they require that such care be tailored to meet each patient's individual needs.

23.     The Care Paths also require the provider to reevaluate treatment at certain intervals called "Decision Points."  Orthopedic examinations of the spine are part of an appropriate re-evaluation. A patient who no longer experiences pain should be discharged. If symptoms continue, the treating provider must provide information about further treatment it intends to provide to the patient for Decision Point Review, which will then determine the propriety of the proposed care.

24.     The administration of any diagnostic test is subject to Decision Point Review regardless of a patient's diagnosis. According to N.J.A.C. §11:3-4.5(b):

The personal injury protection medical expense benefits coverage shall provide for

reimbursement of … diagnostic tests, which have been determined to have value in the evaluation of injuries, the diagnosis and development of a treatment plan for persons injured in a covered accident, when medically necessary and consistent with clinically supported findings…

25.     The New Jersey Care Path System sets forth a daily cap on services for treatment modalities in the amount of $105 per day for three dates of service per week. N.J.A.C. §11:3-29.4(m).

26.     As detailed in paragraphs 46 to 99 below, Defendants' scheme is designed to exploit the New Jersey Care Path System, which enriches Defendants at the expense of substantially reducing the amount of patients' benefits that would otherwise be available for legitimate treatment.

**B.      Pertinent Law Governing Fraud in New Jersey—The Insurance Fraud Prevention Act**

27.     New Jersey enacted legislation, known as the Insurance Fraud Prevention Act ("IFPA"), to combat insurance fraud. N.J.S.A. §17:33A-1, *et seq*.

28.     Under N.J.S.A. §17:33A-4(a), a practitioner violates the IFPA if it:

(1)     Presents or causes to be presented any written or oral statement as part of, or in support of … a claim for payment or other benefit pursuant to an insurance policy … knowing the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(2)     Prepares or makes any written or oral statement that is intended to be presented to any insurance company … or any claimant thereof in connection with, or in support of … any claim for payment or other benefit pursuant to an insurance policy … knowing that the statement contains any

false or misleading information concerning any fact or thing material to the

claim; or

(3)    Conceals or knowingly fails to disclose the occurrence of an event which

affects any person's initial or continued right or entitlement to (a) any

insurance benefit or payment or (b) the amount of any benefit or payment

to which the person is entitled.

29.    A practitioner also violates the IFPA if it knowingly assists, conspires with, or urges any person or practitioner to violate any provision of this act.  N.J.S.A. §17:33A-4(b).

30.    An insurance company damaged as a result of a violation of any provision of the IFPA may sue in any court of competent jurisdiction to recover compensatory damages, including reasonable investigation expenses, costs of suit and attorneys' fees.  N.J.S.A. §17:33A-7(a).

31.    Treble damages shall be awarded to the insurance company if the court determines the defendant has engaged in a pattern of violating the IFPA.   N.J.S.A. §17:33A-7(b).

32.    A "pattern" means five or more related violations involving either the same victim, or same or similar actions on the part of the person or practitioner who violated the IFPA.  N.J.S.A. §17:33A-3.

**C.    The Legitimate Treatment of Patients with Soft Tissue Injuries**

33.    The Defendants purport to evaluate and treat patients who have been in automobile accidents and complain of neck and/or back pain, among other symptoms.

34.    For patients who have been in automobile accidents and have legitimate complaints of neck and/or back pain, or other ailments, a provider must perform a detailed history and legitimate evaluation to arrive at a legitimate diagnosis.

35.     Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a treatment plan tailored to a given patient's unique circumstances. During the course of treatment, licensed professionals should modify treatment plans based upon the unique circumstances of each patient and the response (or lack thereof) of individual patients.

36.     Legitimate treatment plans for patients with soft tissue injuries such as strains or sprains may involve no treatment at all because many of these kinds of injuries resolve without any intervention, or may require a variety of interventions, including over-the-counter medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

37.     Passive modalities do not require any affirmative effort or movement by patients. Many kinds of passive modalities may be appropriate based on an individual patient's unique needs, including: (a) hot/cold packs, (b) ultrasound, (c) e-stim, (d) manual therapy, (e) massage, or (f) traction.

38.     Active modalities require affirmative movement by patients and include a wide variety of exercises, strengthening, and stretching tailored to the unique circumstances of each patient, including the nature and location of the injuries, the physical abilities of patients, and their responses (or lack thereof) to any particular active modality on any day or over time.

39.     In legitimate treatment plans, passive modalities are typically used only to the extent necessary to reduce pain and facilitate the patient's ability to engage in active modalities, and active modalities are introduced as soon as practicable to promote the resolution of symptoms. Therefore, while one or more passive modalities may be medically necessary on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the combination of the same three passive modalities on nearly every visit would rarely, if ever, be appropriate for any patient, let alone for almost every patient.

40.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various services, should vary depending on the unique circumstances of each patient, including: (a) the patient's age, social, family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment, or lack thereof.

41.     Treatment plans should be periodically reassessed and modified (or discontinued) based upon a patient's progress, or lack thereof. To the extent diagnostic tests such as x-rays and MRIs are medically necessary and are performed, the results should be integrated into the diagnosis and the treatment should be changed, modified, discontinued, or even extended based upon results of diagnostic testing.  In some circumstances, it may be appropriate to refer patients to a specialist for continued care.

42.     Patients should be discharged from treatment when they have reached maximum medical improvement ("MMI"), such that no further treatment is likely to benefit the patient.

43.     The above-described process of evaluation, diagnosis, and treatment must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient, whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm Guaranty and State Farm Indemnity, so they can pay for reasonable and necessary treatment.

44.     As described below, Defendants manipulate and abuse the Care Paths provisions to bill for treatment for extended periods of time up to the maximum allowed under the Care Paths. Defendants do not legitimately evaluate or treat the patients for their unique conditions and needs.

11

Instead, Defendants subject patients to the Predetermined Protocol, through which patients receive virtually the same laundry list of services on nearly every visit to exploit their PIP Benefits and enrich the Defendants.

45.     The records associated with the Defendants' purported evaluation and treatment of those patients reveal pervasive and ultimately highly implausible patterns. The Defendants have submitted, or caused to be submitted, this documentation to Plaintiffs in support of bills for services purportedly provided to patients. The documentation is not credible and is fraudulent because it reflects Defendants delivered these services pursuant to the Predetermined Protocol, not because such services were medically necessary to address patients' unique conditions and needs.

**D.     The Defendants' Fraudulent Evaluations and Treatment**

46.     Marshall Chiropractic is owned by Dr. Marshall.

47.     Since at least 2014, the Clinic has purportedly treated insureds of State Farm Guaranty and State Farm Indemnity who were involved in automobile accidents.

48.     Since at least January 2014, Defendants have subjected nearly all State Farm Guaranty and State Farm Indemnity insureds treating at the Clinic to the Predetermined Protocol, regardless of the unique characteristics of each patient.

**1.     The Defendants' Fraudulent Initial Evaluations**

49.     The Predetermined Protocol begins when patients present to the Clinic for initial evaluations. Dr. Marshall purports to perform interviews and examinations of the patients. Ultimately, Dr. Marshall prepares reports containing substantially the same non-credible findings for virtually all patients, and then recommends the same three passive modalities to almost every patient on almost every visit.

12

50.     Dr. Marshall documents the initial evaluations on a pre-printed, typed, two-page form ("Initial Report"). See Ex. D for a representative example of the fraudulent Initial Reports of Marshall Chiropractic.  Dr. Marshall handwrites his findings on these forms, which are noteworthy not only for their lack of detail, but also for the patterns that emerge when the Initial Reports are reviewed across multiple patients.

51.     As detailed above, in a legitimate setting, an initial evaluation requires a comprehensive history and examination so the examiner has sufficient information to formulate an accurate diagnosis and recommend a tailored treatment plan.

52.     Here, the Defendants fail to document a legitimate initial evaluation. Rather, the Initial Reports record only the most basic findings necessary for a patient to be approved for treatment.

53.     The "comprehensive history" portions of the Initial Reports do not in fact detail a meaningful comprehensive history, failing to document: (a) a comprehensive and accurate description of the automobile accident injury; (b) when each symptom developed after impact; (c) the specific location of the patient's pain; (d) activities that provoke pain; (e) specific details regarding the patient's past medical history; or (f) the patient's vital signs (e.g., height, weight, pulse, respiration, temperature, blood pressure), all of which are necessary to adequately provide and document a legitimate prognosis and treatment plan based on individual patient needs. See Ex. D.

54.     The portions of the Initial Reports that purportedly document examinations of the patients reveal virtually every patient (a) reports identical spinal complaints; (b) reports symptoms of tenderness in nearly every level of the spine; (c) experiences muscle spasm across all cervical and lumbar muscle regions tested; (d) has decreased range of motion with pain in every plane

13

measured in the cervical and lumbar regions of the spine; (e) has positive findings for cervical and lumbar orthopedic test results; and (f) is prescribed an identical treatment plan to be administered for the same time period and with the same frequency regardless of individualized factors which, in a legitimate course of treatment, would suggest different treatment plans, including different treatment modalities and different treatment timetables.

55.    These non-individualized Initial Reports are crafted in this fashion to purportedly justify the Predetermined Protocol provided to patients at the Clinic despite the fact this "one size fits all" care is not calculated to, and in fact does not, address patients' unique medical needs. Rather, the Predetermined Protocol is designed to fully exploit and collect the patients' PIP Benefits.

56.    Specifically, the Defendants purport to perform examinations of the entire spine, comprised of the neck (levels C1 to C7), dorsal/thoracic region (levels D1 to D12 or T1 to T12) and the lower back (levels L1 to L5) and the surrounding muscles. If tenderness is reported by the patient during the examination, a "slash" or "/" is marked at that level. See Ex. D, page 1 ("Areas of Tenderness") and page 2 ("Prone Tenderness"). This marking is of little or no value to the evaluation of individual patients because it does not offer clinically meaningful information, such as identifying the location of the tenderness in relation to the spinous process or other structures near the vertebral levels.

57.    According to the Initial Reports, the vast majority of patients subjectively report symptoms of tenderness at nearly every level of the cervical, dorsal/thoracic, and lumbar spine and surrounding muscles during the Initial Evaluation. See Ex. B, columns G to AI.

58.    It is unusual that any given patient would have tenderness in every spinal level and surrounding muscle tested.  Yet, this unlikely finding of spinal tenderness is found in virtually

14

every patient evaluated by the Defendants regardless of individualized factors. Id. The Clinic

reports the alleged presence of tenderness at every level of the spine from the top of the neck (C1)

to the bottom of the lower back (L5) and surrounding muscles. The Defendants use these alleged

findings to justify unnecessary treatment to the entire spine.

59.     The Defendants further attempt to justify unnecessary treatment to at least three

spinal levels by documenting purportedly objective spasm for the vast majority of patients at nearly

every level of the cervical, dorsal/thoracic, and lumbar spine, as well as the surrounding muscles.

See Ex. F. The Defendants document these alleged findings by using the same markings used to

identify areas of tenderness. See Ex. D, page 1 ("Areas of Muscle Spasm") and page 2 ("Muscle

Spasm"). Again, this marking is of little or no value to the evaluation of individual patients because

it does not offer clinically meaningful information, such as identifying the location of the

tenderness in relation to the spinous process or other structures near the vertebral levels.

60.     According to the Initial Reports, virtually every patient has spasm in nearly every

individual level of the cervical, dorsal/thoracic, and lumbar spine, as well as the surrounding

muscles. See Ex. B columns AJ to BM.

61.     It is unusual that any given patient would have spasm in every spinal level tested.

Yet, this unlikely finding is present in virtually every patient evaluated by the Defendants at every

spinal level from the top of the neck (C1) to the bottom of the lower back (L5), as well as the

surrounding muscles regardless of individualized factors.   The Defendants use these alleged

findings to justify unnecessary treatment to the entire spine.

62.     The Defendants also document the results of spinal range of motion testing in the

Initial Examination Reports. See Ex. D, pages 1 and 2 ("Range of Motion"). The purpose of range

of motion testing is to determine the level of spinal functionality across six planes of movement:

flexion, extension, right lateral flexion, left lateral flexion, right rotation, and left rotation.

63.     According to the Initial Reports, the vast majority of Marshall Chiropractic patients who report neck pain have a diminished range of motion in each of the six planes of cervical movement during the Initial Evaluation. See Ex. C, column G.

64.     The following are examples, without limitation, of Marshall Chiropractic patients whose Chiropractic Records reveal the rote, predetermined reporting of reduced range of motion in six planes of cervical movement during initial evaluations which are found throughout the Chiropractic Records:

  a. Patient LDA was 31 years of age at the time of the initial examination on July 20, 2018. Bills and Chiropractic Records were submitted to State Farm Indemnity for PIP benefits under claim number 304987P74. The Initial Reports reveal LDA had diminished range of motion in each of the six planes of cervical movement.

  b. Patient DM was 51 years of age at the time of the initial examination on February 7, 2018. Bills and Chiropractic Records were submitted to State Farm Indemnity for PIP benefits under claim number 303257H85. The Initial Reports reveal DM had diminished range of motion in each of the six planes of cervical movement.

  c. Patient EMC was 46 years of age at the time of the initial examination on August 9, 2017. Bills and Chiropractic Records were submitted to State Farm Indemnity for PIP benefits under claim number 300907G85. The Initial Reports reveal EMC had diminished range of motion in each of the six planes of cervical movement.

  d. Patient IG was 37 years of age at the time of the initial examination on December 6, 2016. Bills and Chiropractic Records were submitted to State Farm Indemnity for PIP benefits under claim number 3003463M2. The Initial Reports reveal IG had diminished range of motion in each of the six planes of cervical movement.

  e. Patient SG was 24 years of age at the time of the initial examination on October 20, 2015. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim number 30748J021. The Initial Reports reveal SG had diminished range of motion in each of the six planes of cervical movement.

65.     Similarly, according to the Initial Reports, the vast majority of Marshall Chiropractic patients who report lower back pain have a diminished range of motion in each of the six planes of lumbar movement during the Initial Evaluation. See Ex. C, column H.

66.     The following are examples, without limitation, of Marshall Chiropractic patients whose Chiropractic Records reveal the rote, predetermined reporting of reduced range of motion in six planes of lumbar movement during initial evaluations which are found throughout the Chiropractic Records:

a.     Patient CAL was 36 years of age at the time of the initial examination on November 4, 2015. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim number 30736G175. The Initial Reports reveal CAL had diminished range of motion in each of the six planes of lumbar movement.

b.     Patient DRR was 32 years of age at the time of the initial examination on October 19, 2015. Bills and Chiropractic Records were submitted to State Farm Indemnity for PIP benefits under claim 307K87581. The Initial Reports reveal DRR had diminished range of motion in each of the six planes of lumbar movement.

c.     Patient JEN was 30 years of age at the time of the initial examination on March 7, 2016. Bills and Chiropractic Records were submitted to State Farm Indemnity for PIP benefits under claim 30825G463. The Initial Reports reveal JEN had diminished range of motion in each of the six planes of lumbar movement.

d.     Patient GAR was 41 years of age at the time of the initial examination on March 8, 2016. Bills and Chiropractic Records were submitted to State Farm Indemnity for PIP benefits under claim 308H20959. The Initial Reports reveal GAR had diminished range of motion in each of the six planes of lumbar movement.

e.     Patient IE was 47 years of age at the time of the initial examination on April 21, 2017. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim 300145Z77. The Initial Reports reveal IE had diminished range of motion in each of the six planes of lumbar movement.

67.     It is unusual that any given patient would have diminished range of motion in each of the planes of spinal movement during the Initial Evaluation. Yet, this unlikely finding is present in virtually every patient evaluated by the Defendants. Again, the Defendants use these alleged findings to justify unnecessary treatment to the entire spine.

68.     The Defendants also allegedly perform a number of orthopedic tests of the spine to identify conditions which are the cause of the patients' alleged pain. The Defendants document the

purported results of the orthopedic testing on the Initial Examination Reports. See Ex. D, pages 1 and 2 ("Orthopedic Testing").

69.     Specifically, the Defendants purportedly perform a number orthopedic tests upon the cervical spine, including Foraminal Compression, Cervical Distraction, Shoulder Depressor, Bechtrew, and Soto Hall. See Ex. D, page 1. If a positive, or abnormal, result is found during the examination, a "+" is marked on the form. See Ex. D, page 1. Such tests are typically administered in a legitimate clinical setting to determine the root cause of upper extremity radicular symptoms such as extremity pain, numbness, or tingling. Positive test results are suggestive of significant orthopedic diagnoses such as radiculopathy, nerve root compression, disc fracture, or other disc pathology.  It is not expected all patients presenting would complain of symptoms suggesting such pathologies.  Nor would it be expected in a legitimate clinical setting that all patients who do complain of such symptoms, and are tested as appropriate, would also demonstrate a positive result suggesting potentially significant orthopedic disorders.  Indeed, in a legitimate clinical setting, it would not be expected all patients would require performance of all such tests.  Instead, orthopedic tests such as those performed by Defendants as a matter of routine on virtually all patients would only be performed to the extent a patient's unique presenting condition and complaints suggest the need for one or perhaps more of the several tests.

70.     According to the Initial Reports, the vast majority of patients who report neck pain have a positive, or abnormal, objective cervical orthopedic testing result during the Initial Evaluation. See Ex. C, columns I to Q.

71.     It is unusual any given patient would have a positive orthopedic test for every test performed. Yet, this unlikely finding of abnormal orthopedic testing is found in virtually every patient evaluated by the Clinic regardless of individualized factors. Documenting such a wide

range of allegedly abnormal objective findings serves as a pretext to justify Defendants' administration of treatment to the cervical and thoracic spine.

72.     The non-credible orthopedic testing results are also present in the documentation of lumbar testing. These tests include Lasegues, Kemps, Minors, Braggards, and straight leg raise. See Ex. D, page 2. If a positive, or abnormal, result is reported by the patient during the examination, a "+" is marked on the form. See Ex. D, page 2. The reported lumbar tests are, in a legitimate clinical setting, performed to determine root causes of lower extremity radicular symptoms.   Positive test results are suggestive of significant orthopedic diagnoses such as radiculopathy, nerve root compression, disc fracture, or other disc pathology.   It is not expected all patients presenting would complain of symptoms suggesting such pathologies.   Nor would it be expected in a legitimate setting that all patients who do complain of such symptoms, and are tested as appropriate, would demonstrate a positive result suggesting potentially significant orthopedic disorders.   And again, in a legitimate clinical setting, it would not be expected all patients would require performance of all such tests.   Orthopedic tests such as those performed by Defendants as a matter of routine on virtually all patients would only be performed to the extent a patient's unique presenting condition and complaints suggest the need for one or perhaps more of the several tests.

73.     According to the Initial Reports, the vast majority of patients who report lower back pain have a positive, or abnormal, result for a select group of objective lumbar orthopedic tests and negative, yet reportedly have normal results for other lumbar orthopedic tests during the Initial Evaluation. See Ex. C, columns R to T.

74.     It is unusual any given patient would have a positive, or abnormal, result for a select group of tests which would justify treatments while having a negative, or normal, testing result for

tests which would contraindicate certain treatments. For example, every patient has a negative George's Test. A positive George's Test contraindicates chiropractic manipulations, which in turn would deviate from the rote course of treatment recommended for virtually every patient. This unlikely finding of orthopedic testing results is found in virtually every patient evaluated by the Clinic regardless of individualized factors. This pattern of objective findings serves as justification for the Defendants' rote, non-individualized treatment plan for the spine.

75.     Based upon the non-individualized, rote, and pre-determined elements of purported initial evaluations described above, Defendants prescribe for virtually every patient an identical pre-determined treatment plan.  In legitimate clinical care, the types of treatment appropriate for any given patient as well as the level, frequency, and duration of the various services should vary depending on the unique circumstances of each patient.  The treatment plan prescribed at the Clinic, however, is identical in type, frequency, and duration of care for almost every patient, to include passive treatment three times each week for four weeks in the form of chiropractic manipulation to three to four spinal levels (CPT code 98941), manual therapy (CPT code 97140-59), and electric stimulation (CPT code G0283). See Ex. C, column S.

## 2.    The Defendants' Fraudulent Protocol Treatment

76.     Following the Initial Evaluations, patients allegedly begin the treatment regimen outlined in the Initial Report. The Defendants document these treatment visits in hand-written notes ("Chiropractic Daily Progress Notes"). See Ex. E. The Clinic then bills State Farm Guaranty or State Farm Indemnity for the treatment allegedly provided to the patients.

77.     Regardless of the results of any initial evaluation purportedly performed, any unique circumstances presented by an individual patient, or any prior care a given patient may have received before presenting at the Clinic, the Chiropractic Daily Progress Notes document

virtually every patient receives nearly identical passive treatment (chiropractic manipulation to three to four levels, manual therapy, and electric stimulation) on every visit from the initiation of care until discharge.  See Ex. A. Under the Auto Medical Fee Schedule, Defendants' billing for this combination of nearly identical passive treatment totals around $107.00 per visit which closely aligns each time with the daily fee cap maximum of $105.00 mandated under N.J.A.C. 11:3-29.4(m).

78.     This combination of treatments, with patients allegedly receiving the same three passive modalities on nearly every visit, would seldom, if ever, be medically necessary for any patient, let alone for nearly all patients, on every visit.  To the contrary, good clinical care would indicate no care for some patients, less or even more care for others, and a different variety of modalities for different patients, as opposed to the same treatment plan for all patients as is the Predetermined Protocol at the Clinic.

79.     Further, notwithstanding that legitimate treatment plans for traumatically injured patients seek to phase out passive modalities as quickly as reasonably possible in favor of active modalities, the Defendants rarely perform any active modalities upon the patients at the Clinic. Defendants' reliance on passive treatment without introducing active modalities is evident in Ex. A. The Defendants' failure to introduce active modalities to their patients underscores the meaningless nature of Defendants' initial examinations and prescribed treatment plans and the fraudulent treatment allegedly rendered to all the patients of the Defendant Clinic.

80.     The Defendants' reliance on passive treatment without the introduction of active modalities is evident in Ex. A. This chart illustrates treatment rendered to over 200 patients over 6,600 visits. Only seven of these patients (CALV, GM, JFQ, MC, MEO, NC and ZJ) participated in any active treatment. Incredibly, Defendants billed for an active modality (therapeutic exercise)

21

on only 43 of the over 6,600 visits. The Defendants' failure to introduce active modalities to their patients highlights their scheme to exploit PIP benefits while not addressing the unique circumstances and needs of the individual patient.

81.     The Defendants' fraud is also apparent in their provision of unnecessary chiropractic manipulations.   In a legitimate setting, patients commonly receive chiropractic manipulations to one or two spinal regions. However, the Defendants never bill for manipulations to less than three or four regions of the spine. The Chiropractic Daily Progress Notes do not even allow for the selection of a spinal manipulation code other than CPT code 98941. See Ex. E.

82.     Billing chiropractic manipulation exclusively as CPT code 98941 on every treatment visit for every patient is implausible and reflects every patient has the same spinal complaints and chiropractic needs and never requires a lesser level of service on any visit.   The presence of spasms and tenderness in at least one level within each spinal region only serves to further inflate the potential reimbursement the Defendants can recover from Plaintiffs by effectively ensuring a higher level of manipulation occurs for the longest possible duration.

### 3.     The Defendants' Fraudulent Re-Examinations

83.     In a legitimate course of care, patients are re-examined at regular and defined intervals to determine whether the initial course of conservative care has been successful. The New Jersey Care Paths require that patients show some degree of improvement in symptoms after the first thirty days of care to justify additional treatment. If symptoms have resolved, the treating provider must discharge the patient. If symptoms have minimally resolved, the treating provider may recommend additional conservative treatment, a course of physical therapy, referral to a specialist, pain management up to three visits, or some combination of these options. If symptoms have worsened, the treating provider may consider diagnostic testing.

84.     Here, the Defendants re-evaluate patients and document their findings on the same form used by the Defendants during Initial Evaluations. See Ex. F for an exemplar of the "Re-Evaluation Reports."

85.     The Defendants document patient improvement on each re-evaluation in a manner which attempts to satisfy the Care Path requirements while ensuring prolonged and unnecessary treatment. The Defendants accomplish this goal by documenting gradually improving tenderness and spasm in every region of the spine during each re-evaluation. See Ex. F, "Areas of Tenderness" and "Areas of Muscle Spasm."

86.     The spine is divided into four regions: cervical, thoracic, lumbar, and sacral. Each region is divided into levels by the number of vertebra present in the region. The cervical spine has seven vertebral levels which range from C1 (the top of the cervical spine) to C7 (the bottom of the cervical spine).  The thoracic spine has twelve vertebral levels which range from T1 (the top of the thoracic spine) to T12 (the bottom of the thoracic spine). The lumbar spine has five vertebral levels which range from L1 (the top of the lumbar spine) to L5 (the bottom of the lumbar spine). Finally, the sacrum has five bones (S1 through S5) which fuse to form the sacrum.

87.     According to the Re-Evaluation Reports, virtually every patient demonstrates nearly identical rates of improvement in spinal muscle spasm and tenderness. See Ex. G for a chart documenting patterns in improvement of spinal tenderness and spasm across the patients.

88.     Nearly every patient begins to experience improvement of tenderness from either the top or bottom of a spinal region (i.e. from C1 to C7, D/T12 to D/T1, and L1 to L5). Id. Thereafter, patients experience improvement in tenderness in a linear fashion in each level of the spine (i.e. improvement from C1 to C2 to C3, and so on). The following tables[1] are examples of

---

[1] The tables depict the areas of tenderness (top row) based on the number of reevaluation (left side).  An "X" denotes a patient purportedly exhibited tenderness in that level of the spine during the examination.  The chart illustrates how

the pattern of improvement of cervical, thoracic, and lumbar tenderness starting at spinal levels C1, T12, and L1 and progressing in the same linear fashion through the remaining spinal levels as seen across the Chiropractic Records:

CERVICAL SPINE TENDERNESS IMPROVEMENT

| Evaluation VISIT NUMBER | C1 | C2 | C3 | C4 | C5 | C6 | C7 |
|---|---|---|---|---|---|---|---|
| 1 | X | X | X | X | X | X | X |
| 2 |   | X | X | X | X | X | X |
| 3 |   |   | X | X | X | X | X |
| 4 |   |   |   | X | X | X | X |
| 5 |   |   |   |   | X | X | X |
| 6 |   |   |   |   |   | X | X |
| 7 |   |   |   |   |   |   | X |
| 8 |   |   |   |   |   |   | X |

THORACIC/DORSAL SPINE TENDERNESS IMPROVEMENT

| Evaluation VISIT NUMBER | T1 | T2 | T3 | T4 | T5 | T6 | T7 | T8 | T9 | T10 | T11 | T12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | X | X | X | X | X | X | X | X | X | X | X | X |
| 2 | X | X | X | X | X | X | X | X | X | X |   |   |
| 3 | X | X | X | X | X | X | X |   |   |   |   |   |
| 4 | X | X | X | X | X | X |   |   |   |   |   |   |
| 5 | X | X | X | X |   |   |   |   |   |   |   |   |
| 6 | X | X | X | X |   |   |   |   |   |   |   |   |
| 7 | X | X | X |   |   |   |   |   |   |   |   |   |
| 8 | X | X | X |   |   |   |   |   |   |   |   |   |

---

all patients heal at exactly the same rate over the same time.

LUMBAR SPINE TENDERNESS IMPROVEMENT

| Evaluation VISIT NUMBER | L1 | L2 | L3 | L4 | L5 |
|---|---|---|---|---|---|
| 1 | X | X | X | X | X |
| 2 | X | X | X | X | X |
| 3 | X | X | X | X | X |
| 4 | | X | X | X | X |
| 5 | | | X | X | X |
| 6 | | | | X | X |
| 7 | | | | | X |
| 8 | | | | | X |

89.     The Re-Examination Reports also reveal that nearly every patient begins to experience improvement of spasm from either the top or bottom of a spinal region (i.e. from C1 to C5, D/T12 to D/T1, and L1 to L5). See Exhibit G.  Thereafter, patients experience improvement in spasm in a linear fashion in each level of the spine (i.e. improvement from C1 to C2 to C3, and so on). The following tables[2] are examples of the pattern of improvement of cervical, thoracic, and lumbar spasm starting at spinal levels C1, T12 and L1 and progressing in the same linear fashion through the remaining spinal levels as seen across the Chiropractic Records:

---

[2] The tables depict the areas of muscle spasm (top row) based on the number of reevaluation (left side).  An "X" denotes that a patient purportedly exhibited spasm at that particular spinal level upon examination. The chart illustrates how all patients heal at exactly the same rate over the same time.

CERVICAL SPINE SPASM IMPROVEMENT

| Evaluation VISIT NUMBER | C1 | C2 | C3 | C4 | C5 | C6 | C7 |
|---|---|---|---|---|---|---|---|
| 1 | X | X | X | X | X | X | X |
| 2 |  | X | X | X | X | X | X |
| 3 |  |  | X | X | X | X | X |
| 4 |  |  |  | X | X | X | X |
| 5 |  |  |  |  | X | X | X |
| 6 |  |  |  |  |  | X | X |
| 7 |  |  |  |  |  |  | X |
| 8 |  |  |  |  |  |  | X |

THORACIC/DORSAL SPINE SPASM IMPROVEMENT

| Evaluation VISIT NUMBER | T1 | T2 | T3 | T4 | T5 | T6 | T7 | T8 | T9 | T10 | T11 | T12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | X | X | X | X | X | X | X | X | X | X | X | X |
| 2 | X | X | X | X | X | X | X | X | X | X |  |  |
| 3 | X | X | X | X | X | X | X | X |  |  |  |  |
| 4 | X | X | X | X | X | X |  |  |  |  |  |  |
| 5 | X | X | X | X | X |  |  |  |  |  |  |  |
| 6 | X | X | X | X |  |  |  |  |  |  |  |  |
| 7 | X | X | X |  |  |  |  |  |  |  |  |  |
| 8 | X | X | X |  |  |  |  |  |  |  |  |  |

LUMBAR SPINE SPASM IMPROVEMENT

| Evaluation VISIT NUMBER | L1 | L2 | L3 | L4 | L5 |
|---|---|---|---|---|---|
| 1 | X | X | X | X | X |
| 2 | X | X | X | X | X |
| 3 | X | X | X | X | X |
| 4 |  | X | X | X | X |
| 5 |  |  | X | X | X |
| 6 |  |  |  | X | X |
| 7 |  |  |  |  | X |
| 8 |  |  |  |  | X |

90.     The following are examples, without limitation, of patients whose Chiropractic Records reveal the rote, predetermined reporting of spinal tenderness and spasm improvement during re-evaluations which are found throughout the Chiropractic Records:

a.  Patient MA was 19 years of age at the time of the initial examination on April 25, 2016. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim number 308H08568. The Re-Examination Reports reveal MA experienced improvement of spinal tenderness and spasm starting at spinal levels C1, T12, and L1 and progressing in the same linear fashion through the remaining spinal levels.

b.  Patient JP was 20 years of age at the time of the initial examination on April 22, 2014. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim number 304F80694. The Re-Examination Reports reveal JP experienced improvement of spinal tenderness and spasm starting at spinal levels C1, T12, and L1 and progressing in the same linear fashion through the remaining spinal levels.

c.  Patient EM was 32 years of age at the time of the initial examination on March 12, 2015. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim number 3038F0181. The Re-Examination Reports reveal EM experienced improvement of spinal tenderness and spasm starting at spinal levels C1, T12, and L1 and progressing in the same linear fashion through the remaining spinal levels.

d.  Patient VM was 48 years of age at the time of the initial examination on October 27, 2015. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim number 30759P946. The Re-Examination Reports reveal VM experienced improvement of spinal tenderness and spasm starting at spinal levels C1, T12, and L1 and progressing in the same linear fashion through the remaining spinal levels.

e.  Patient GC was 78 years of age at the time of the initial examination on March 7, 2016. Bills and Chiropractic Records were submitted to State Farm Guaranty for PIP benefits under claim number 30812J458. The Re-Examination Reports reveal GC experienced improvement of spinal tenderness and spasm starting at spinal levels C1, T12, and L1 and progressing in the same linear fashion through the remaining spinal levels.

91.     According to the Re-Evaluation Reports, virtually all patients demonstrate nearly identical rates of improvement with their examination findings beginning on the third re-evaluation. See Ex. G. Defendants report that virtually every patient exhibits the same progression

27

with the decrease in spinal tenderness and spasm, specifically, nearly all patients improve from the top or bottom of a spinal region to the bottom or top of the same region. For example, improvement in the cervical spine begins with a negative finding at the highest level (C1) and subsequent exams reveal negative findings in descending order of that spinal level (i.e. C2, C3, etc.) Id. The same progression of improvement is observed in the lumber spine (from L1 to L5) and in the reverse in the dorsal/thoracic spine (from D/T 12 up to D/T 1). Id. This implausible and non-credible pattern of healing, across most patients, which the Defendants use to justify continuing treatment, is depicted in the chart attached as Ex. G.

92.     Based on the alleged continuing complaints and alleged abnormal objective findings, the Defendants also refer a vast majority of the patients for MRI and/or EMG/NCV testing. See Ex. H. One purpose of the referral for MRI and/or EMG/NCV testing is to purportedly obtain objective evidence which supports continuing treatment by the Defendants. However, the Defendants never alter the treatment plan based on the results of such objective testing.

93.     For example, patient DAF allegedly treated with Marshall Chiro for 81 visits. DAF underwent MRI testing between visits 20 and 21. The MRI of DAF is reported as abnormal. Nevertheless, Marshall Chiro did not alter its treatment regimen for DAF between visits 22 and 81. DAF underwent EMG testing between visits 35 and 36, which was abnormal. Nevertheless, Marshall Chiro did not alter its treatment regimen between visits 37 and 81. Another example is patient MA who allegedly treated with Marshall Chiropractic for 73 visits. MRI testing was performed between visits 19 and 20, EMG testing was performed between visits 37 and 38. The MRI and EMG/NCV studies were abnormal. Nevertheless, Marshall Chiropractic did not alter its treatment regimen for MA between visits 21 and 73.

94.     Overall, the Chiropractic Records reveal no evidence the Defendants treat the

insureds of State Farm Guaranty and State Farm Indemnity as individuals. At no time do the Defendants alter any given patient's treatment plan, regardless of his or her reported complaints, individual exam findings, MRI or EMG findings, response (or lack thereof) to the purported treatment administered, or any other factor unique to that patient.

### 4.   Coverage Is Exploited

95.    The Defendants manipulate the New Jersey Care Paths by creating the need, through their documentation and provision of the foregoing treatment pursuant to the Predetermined Protocol so that they can increase the charges they can submit to State Farm Guaranty and State Farm Indemnity to exploit their patients' PIP Benefits, not because such treatment is medically necessary to address the unique needs of each patient.

### E.   **Plaintiffs' Justifiable Reliance**

96.    The Defendants submitted, and caused to be submitted, bills and supporting records falsely representing the services that Defendants provided were medically necessary when, in fact, Defendants provided these services pursuant to the Predetermined Protocol and not to address the patients' unique circumstances and needs.

97.    State Farm Guaranty and State Farm Indemnity are under statutory and contractual duties to promptly pay PIP Benefits for medically necessary services. The bills and supporting records the Defendants submitted, and caused to be submitted, to Plaintiffs in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause Plaintiffs to justifiably rely on them.

98.    The Defendants were obligated legally and ethically to act honestly and with integrity. Yet, the Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Guaranty and State Farm Indemnity. Each

bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature. Only when the bills and supporting records at issue are viewed together as a whole and over time, do the patterns emerge revealing the fraudulent nature of all the bills and supporting records.

99.     As a result, State Farm Guaranty and State Farm Indemnity have incurred damages of more than $850,000 in benefits paid based on the fraudulent charges.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### COMMON LAW FRAUD
### PLAINTIFFS v. ALL DEFENDANTS

100.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 99 above.

101.    The acts committed by Defendants, their agents, employees and others acting at their direction and/or under their control as set forth above are false and fraudulent and constitute material misrepresentations and/or omissions of fact.

102.    The misrepresentations, fraudulent conduct and other acts and omissions committed by the Defendants constitute false and fraudulent representations as set forth in paragraphs 1 through 99, above.  Such fraudulent representations include but are not limited to: (a) the Defendants performed legitimate initial examinations that were medically necessary to address the unique needs of each patient, when, in fact, they are not performed to determine the true nature and extent of patients' injuries and to arrive at a treatment plan to address their true needs, but rather to report the same or similar physical findings and non-specific diagnoses to justify a predetermined course of treatment; (b) the Defendants formulated legitimate treatment plans that were medically necessary to address the unique needs of each patients, when, in fact,

they are not formulated to address the true nature and extent of patients' injuries, but the treatment plans instead consist of the same or similar combinations of nearly exclusively passive modalities provided to most patients on almost every visit, regardless of the unique circumstances and needs of each patient; and (c) the Defendants performed legitimate reexaminations, which, for the reasons discussed in paragraphs 83 to 94 above, are not in fact legitimate but instead document formulaic, predetermined findings that misrepresent that ongoing additional therapy is needed.

103.    Defendants, their agents, employees, and others acting at their direction and/or under their control made the aforementioned misrepresentations and/or omissions of fact knowing the false and fraudulent nature of the representations and omissions.

104.    Defendants, their agents, employees, and others acting at their direction and/or under their control intended to defraud Plaintiffs, knowing Plaintiffs would be induced by such misrepresentations and omissions of fact to provide payment to Defendants for alleged treatment set forth in the Chiropractic Records.

105.    Plaintiffs justifiably and reasonably relied upon the misrepresentations and omissions of fact made by Defendants, their agents, employees, and others acting at their direction and/or under their control and made payments to Defendants of approximately $850,000 in fraudulent bills.

WHEREFORE, Plaintiffs demand that this Court enter judgment in their favor and against Defendants, jointly and/or severally, for an amount in excess of $850,000 for compensatory damages, together with interest and costs, and such other relief permitted by law and that the Court shall deem appropriate.

## SECOND CAUSE OF ACTION
## NEW JERSEY INSURANCE FRAUD PREVENTION ACT
## <u>PLAINTIFFS v. ALL DEFENDANTS</u>

106.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 105 above.

107.    Defendants knowingly prepared, submitted or caused to be submitted, and continue to prepare, submit and cause to be submitted, hundreds of pre-certification and re-certification submissions to Plaintiffs pursuant to the Care Path provisions that were false or contained material misrepresentations in the claim such as:

(i)     The bills and supporting Chiropractic Records submitted to Plaintiffs misrepresented the severity and intensity of patient complaints by exaggerating the nature, severity, and extent of the purported injuries and symptoms; and

(ii)    The bills and supporting Chiropractic Records submitted to Plaintiffs recommended a number of follow-up visits for examinations, chiropractic treatment, and other treatment that were medically unnecessary, expensive, and pre-determined to financially enrich the Defendants instead of providing individualized patient care.

108.    Defendants' systematic violation of the New Jersey Insurance Fraud Prevention Act constituted a pattern as more fully described in this Complaint and pursuant to N.J.S.A. 17:33A-1, et seq.

WHEREFORE, Plaintiffs demand that this Court enter judgment in their favor and against Defendants, jointly and/or severally, for an amount in excess of $850,000 for compensatory damages, as well as: (1) treble damages; (ii) the costs and counsel fees incurred in connection with

32

the investigation conducted by Plaintiffs; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-1, et seq., and such other relief permitted by law and that the Court shall deem appropriate.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**PLAINTIFFS v. ALL DEFENDANTS**

109.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 108 above.

110.    As explained in detail above, Defendants, their agents, employees or others acting at their direction and control, engaged in fraudulent conduct violating New Jersey law, all of which caused harm to Plaintiffs.

111.    Plaintiffs paid the bills submitted or caused to be submitted by Defendants from insureds' automobile policies and PIP benefits based on the reasonable belief that Plaintiffs were legally obligated to pay for the services, when in fact the billing submissions were fraudulent.

112.    Defendants have been enriched at Plaintiffs' harm and expense which is a benefit Defendants willingly accepted knowing the Chiropractic Records submitted were part of a fraudulent scheme.

113.    Defendants were and continue to be unjustly enriched. To allow Defendants to retain monies wrongfully paid would violate fundamental principles of justice, fairness, equity, and good conscience.

WHEREFORE, Plaintiffs demand that this Court enter judgment in their favor and against defendants, jointly and/or severally, for an amount in excess of $850,000 for compensatory damages and such other relief permitted by law and that the Court shall deem appropriate.

## FOURTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
## <u>PLAINTIFFS v. ALL DEFENDANTS</u>

114.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

115.    There is an actual controversy between Plaintiffs and the Defendants relating to claims for the alleged services provided to insureds of Plaintiffs.  These claims in the form of Chiropractic Records continue to be submitted by the Defendants to Plaintiffs.

116.    In each and every claim submitted to Plaintiffs, Defendants knowingly made one or more of the material misrepresentations described in the paragraphs above.

117.    The Defendants have no legal or equitable right to receive payment from Plaintiffs for any bill submitted to Plaintiffs which includes false, misleading, inaccurate, and/or fabricated statements and representations.

WHEREFORE, State Farm Guaranty and State Farm Indemnity demand that this Court enter judgment in their favor pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     Plaintiffs have no legal or equitable obligation to issue reimbursement to Defendants on any outstanding or unpaid claims for payment based on any Chiropractic Records submitted prior to the commencement of this action; and

(ii)    Plaintiffs have no legal or equitable obligation to issue reimbursement to Defendants for any Chiropractic Records submitted subsequent to the filing of this action which include false, misleading, inaccurate, and/or fraudulent statements and representations.

34

## JURY DEMAND

118.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, State Farm Guaranty and State Farm Indemnity demand that this Court enter judgment in their favor:

A.     On the First Cause of Action (Common Law Fraud) against All Defendants, jointly and/or severally, for an amount in excess of $850,000 for compensatory damages, together with interest and costs, and such other relief permitted by law and that the Court shall deem appropriate;

B.     On the Second Cause of Action (New Jersey Insurance Fraud Protection Act) against All Defendants, jointly and/or severally, for an amount in excess of $850,000 for compensatory damages, as well as: (1) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by Plaintiffs; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-1, et seq., and such other relief permitted by law and that the Court shall deem appropriate;

C.     On the Third Cause of Action (Unjust Enrichment) against All Defendants, jointly and/or severally, for an amount in excess of $850,000 for compensatory damages and such other relief permitted by law and that the Court shall deem appropriate; and

D.     On the Fourth Cause of Action (Declaratory Judgment) against All Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 that:

(i)  Plaintiffs have no legal or equitable obligation to issue reimbursement to Defendants on any outstanding or unpaid claims for payment based on any Chiropractic Records submitted prior to the commencement of this action; and

(ii)  Plaintiffs have no legal or equitable obligation to issue reimbursement to Defendants for any Chiropractic Records submitted subsequent to the filing of this action which include false, misleading, inaccurate, and/or fraudulent statements and representations.

BENNETT, BRICKLIN & SALTZBURG LLC

Date: 2/21/2020          BY: _____
                              Charles J. Lanzalotti, Esq.
                              6000 Sagemore Drive, Suite 6103
                              Marlton, NJ 08053-3900
                              (856) 673-3471 telephone
                              (856) 751-5281 facsimile
                              lanzalotti@bbs-law.com
                              Counsel for Plaintiffs, State Farm Guaranty
                              Insurance Company and
                              State Farm Indemnity Company

                              Edward J. Bradley, Jr. (*pro hac vice*)
                              (admission pending)
                              James T. Moughan (*pro hac vice*)
                              (admission pending)
                              Marc B. Bailkin (*pro hac vice*)
                              (admission pending)
                              Bennett, Bricklin & Saltzburg LLC
                              Centre Square West
                              1500 Market Street
                              32nd Floor
                              Philadelphia, PA  19102
                              215-561-4300
                              215-561-6661 (facsimile)
                              bradleye@bbs-law.com
                              moughan@bbs-law.com
                              bailkin@bbs-law.com